## No. 8589.

### THE PRESIDENT AND DIRECTORS OF THE CONSOLIDATED ASSOCIATION OF THE PLANTERS OF LOUISIANA VS. GEORGE J. LORD.

The judicial decree rendered in 1842, declaring the charter of the plaintiff forfeited, terminated its corporate existence.

The Act of 1847 laid upon the managers and directors of the plaintiff the duty of requiring of the stockholders such annual payments as would accumulate a fund sufficient to meet the obligations of the State, restricting them only in this, that the equal instalments should run from one to seventeen years.

When the managers and directors accepted the terms offered them by the State in this Act, and levied a contribution of six dollars on each share of every stockholder as sufficient to meet the obligations of the State issued for this Association, a contract was thereby made by and between the State and the stockholders which neither can be permitted to violate.

The attempt of the State, by the Act of 1878, to impose a further contribution of forty dollars per share upon each stockholder, is a violation of this contract, and cannot be enforced.

The annual contributions of six dollars per share are prescriptible in five years.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

*J. C. Egan*, Attorney General, and *John McEnery* for Plaintiffs and Appellees:

1. "One who contracts with what he acknowledges to be and treats as a corporation, incurring obligations in its favor, is estopped from denying its corporate existence, particularly when the obligations are sought to be enforced." Latolais, Administratrix, vs. Citizens' Bank of Louisiana.

2. "Although a corporation had expired by limitation, and judgment of forfeiture of charter had also been pronounced against it on behalf of the State, yet, when, from the nature and objects of the institution, a power to liquidate its affairs after the expiration of its charter might have been foreseen as absolutely necessary, the power to accept from the State an extension of the charter for the purpose of liquidation will be implied; and this extension enabled it to sue a defaulting stockholder, notwithstanding the enabling statute was passed subsequent both to the decree of forfeiture and the expiration of the charter by limitation." 7 An. 319.

3. "There is no prescription of obligations of individuals for the security of stock subscribed and unpaid as long as the liquidation of the company continues." 12 An. 528; 27 An. 535.

4. By Act No. 19, Sec. 14, of 1827, the liability of the stockholders depended upon the payment of the debts of the corporation; and not until after its debts had been paid and settled was the entire stock obligation due, and no prescription could possibly begin to run until after that date.

*J. A. Campbell* on the same side.

*R. H. Marr* and *Jules Lavergne* for Defendant and Appellant:

1. The Act 100 of 1847 was a contract between the State and the stockholders of the Consolidated Association; and it fixes definitively the rights and obligations of both parties.

2. The amount to be contributed by the stockholders having been fixed by that Act, the State is debarred from requiring any additional contribution by them.

3. Every stockholder has the right to invoke the benefit of that Act as fixing the entire amount to be contributed by him, and as a bar to any claim for further contribution.

4. The Act No. 20 of 1878 is in violation of the Constitution of the United States, Article 1, Section 10, in that it impairs the obligation of the contract created by the original charter of the Association; and in that it impairs the obligation of the contract created by the Act No. 100 of 1847.

5. The right to call upon the stockholders for contribution was exhausted in 1847.

6. The right to call upon the stockholders for contribution accrued when the Association became insolvent; and this right was barred by the lapse of more than thirty years from the date of the accruing of that right, and the passage of Act No. 20 of 1878, and the assessment made under that Act in July, 1880.

*Chas. F. Claiborne* and *Blanc & Butler* on the same side.

The opinion of the Court was delivered by

BERMUDEZ, C. J.   This is an action to recover from the defendant contributions assessed against him as stockholder of the Consolidated Association of the Planters of Louisiana, the payment of which is alleged to be secured by special mortgage on certain urban real estate.

The contributions first claimed are of six dollars on each of his 22 shares of $500 each, for five years, including 1865, with interest at eight per cent.   They were levied under the provisions of Sec. 6 of Act 100 of 1847, extending the liquidation of the Association.

The contributions secondly claimed are of forty dollars on each of

the same shares, with like interest. They were imposed under the terms of Act 40 of 1878, providing for a final liquidation of the concern.

Both contributions are claimed to satisfy an indebtedness to the State, and a liability incurred by her for the Association.

Under the averment of her claim and of an interest in the recognition and enforcement of the demand the State intervened, joining and assisting plaintiffs.

Numerous defenses were set up, which can be said substantially to be: that the petitioners have no standing in court; that their right of action is barred by prescription; that the State is no creditor of the concern and has no interest in the litigation, and that, lacking a foundation, the claim must fail.

From a judgment overruling the exception to plaintiffs' capacity to sue, and referring other defenses set up *in limine* to the merits, and from another judgment entitling the petitioners to recover, the defendant has appealed.

## On Exceptions.

The plaintiffs were appointed under authority of Acts Nos. 113 of 1853 and 40 of 1878, for the purpose of bringing the liquidation of the affairs of the concern to a final close. To that end they brought the present suit. The complaint is that they did not set forth their names, but merely stated their official capacities.

It was not requisite that they should have given their names. As corporate bodies and chartered institutions can, during their existence, act judicially under the name or title given them in the act of incorporation, without mentioning the names of the officers representing them, so, when those organizations have ceased to operate and are in liquidation, the parties entrusted with the winding up of their business can sue in their official capacities without stating their individual names. C. P. 112; 6 An. 542. The plaintiffs have made themselves sufficiently known to the defendant by designating their titles.

Suits brought by persons as agents, or for the use of others, have often been decided to have been properly instituted, and defendants have been held to answer the demand. H. D. 1124. Had the defendant seasonably denied the existence of any person entitled to the capacity alleged, the plaintiffs could have been held before issue joined to identify themselves with the trust, but that denial was never entered.

The corporation was created in 1827. Its charter was modified in the year following. Its existence was to terminate in 1843; but in 1842 its charter was judicially declared forfeited.

In 1847, with the consent of the stockholders, an assessment was

levied and the period of liquidation was extended to 1865. In the year following the legislature authorized a continuation of the liquidation until the maturity of the bonds which the State had issued in aid of the institution.

In 1878 an Act was passed directing a process of liquidation and providing for the continuation of previous officials, and for the appointment of additional ones. This suit was brought by such officials.

In the exercise of powers inherent to all well regulated governments over insolvent estates, the legislature was authorized to adopt the Acts which it passed for the liquidation of the business of the Association. Those powers have constantly been exercised in Europe, in our sister States and in our own, in some form or other. 12 An. 288; 10 R. 460; 7 An. 319; 5 An. 470; 7 An. 286; 6 An. 457; 5 An. 740.

The plaintiffs are rightfully in court and can sue as they have done. A payment made to them in their official capacity, of any sum due to the concern, would exonerate the debtor and conclude the organization and all interested therein. 9 An. 265; 7 An. 114; 8 An. 132; 9 An. 341.

The exception to the right of plaintiffs to represent the concern in this suit and to the mode in which they have appeared in court to represent it was not well taken and was properly overruled. The other defenses advanced *in limine* could not be dealt with as exceptions and were properly referred to the merits, to which they really belong. The reference could occasion defendant no injury.

---

### ON THE MERITS.

We think proper to premise that, although it is admitted that the State has filed an intervention, we have failed to discover it in the transcript. It was agreed, however, that the defenses raised against the plaintiffs would be deemed as urged against the State.

From the lengthy and elaborate answer of the defendant and the oral and printed arguments, all of which strenuously deny any liability either to the concern or to the State, the main defenses may be considered as being:

- That the claim is prescribed; that the debt was novated and the mortgage extinguished; that, by the payment of certain instalments levied under the Act of 1847, the stockholders were completely discharged; that each stockholder can be held only for his share of the debts of the Association and not for the delinquency of other stockholders or deficiency of the property mortgaged; that this proportion should be computed on the original 6,000 shares subscribed; that not more than five per cent. can be claimed on arreared contributions; that the stockholders have a right to pay such proportion in

any bond issued by the State, under the Funding Act of 1874, or the. Constitution of 1879, that is,.$60 for $100; and upon so doing, that. they are entitled to a discharge from all indebtedness and to a cancellation of the mortgage.originally consented on their property, solely for the eventual payment of the shares subscribed for, and in no way. for that of the bonds issued by the State.

The demand and the defenses being stated, the merits must now be inquired into.

The corporation having failed to raise the capital necessary for its banking operations by the negotiation of its bonds, which were authorized to be issued by the act of incorporation of 1827, the State became a stockholder, and under the Act of 1828, uttered her own bonds, acknowledging therein an indebtedness to the corporation, by whose endorsement they were to be transferrable. The officers of the corporation endorsed the bonds, with a stipulation of its liability therefor, disposed of them, received the proceeds and applied the same to its purposes. The payment or reimbursement of those bonds. was secured by a pledge of all the assets of the corporation, including the mortgage consented by the stockholders to make certain the payment of the shares subscribed for by them. The payment of those bonds was, from time to time, extended. A large number of the same was funded under the Funding Act of 1874 by the holders, who, upon. receiving from the State other bonds of hers in discharge of their claim against her, ceded and transferred unto her all their right, title, and interest in and to the same and to the securities guaranteeing the. payment or reimbursement thereof, fully subrogating the State thereto.

The State then became a creditor of the concern for the amount of the bonds funded, or, at least, for the amount of the bonds given in place thereof, acquiring, both by conventional and legal subrogation, all the rights which the holders of the funded bonds could have exercised against the Association to coerce payment.

It is not correct to say that it was essential for the State to have *paid in money* the bondholders, in order to be subrogated by them to their rights. It was optional with them to accept either money, or any other valuable consideration for the cession and subrogation. The transfer could have taken place even without any consideration. The. cession, transfer and subrogation could have been made as a benevolence, or as a gratuity.

But it was not necessary that there should be any conventional subrogation. As the concern was bound for the payment of the bonds *with* the State, or the State was liable *with* it and *for* it, the State had, an interest to acquit or discharge the debt as far as she was concerned, and she could do so on terms acceptable to the holders and most suit-

able to her interest. She obtained thereby her release from the holders, with a curtailment of 40 per cent. on the dollar. Whether this partial release accrues to the benefit of the State alone or to that of the concern also, is a question which is not presented in this case, and which does not require a decision presently. It will be time to determine it when the issue will be properly submitted.

It is for the purpose of meeting the indebtedness in favor of the State, as also of paying what unfunded State bonds may exist, that the contributions, particularly that of $40 per share, have been raised.

The liability of the Association for the payment of the bonds of the State was constantly acknowledged by it. It was recognized in the Forstall case, lately decided, 34 An. p. 770, O. B. 56, fo. 1032. That acknowledgment concludes absolutely both itself and the stockholders. It cannot, therefore, plead an extinction of it, either by prescription, novation or otherwise. Its liability therefor is commensurate with that of the stockholders, which extends ratably to the amount of their subscription for stock, secured by mortgage on the property subjected thereto, or so much of said subscription as may be necessary to satisfy the liability for the bonds. 18 An. 310; 24 An. 405.

The right of holders for payment was declared to be imprescriptible, the State not being suable. 30 An. 611. The obligation of the Association, whatever it was, to discharge the obligations which the State had incurred for its benefit, was co-extensive with the responsibility of the State. The securities guaranteeing the fulfilment of that obligation have continued unimpaired, unless prescribed, and will so remain until the liability secured shall have been satisfied.

The defense, as against both the plaintiffs and the State, that the latter is no creditor and that no call can be made to pay a debt which has no existence, would have been formidable, indeed, destructive of the action, if founded; but such is not the case.

It is undeniable that, in 1850, when he purchased from the Mechanics' & Traders' Bank the property on which the mortgage is claimed, the defendant acquired, at the same time, the twenty-two shares which had been previously bought from Widow Duplessis, an original stockholder, and that he assumed, or took the reversion of the mortgage given by her to secure the payment of that stock, then valued at $500 per share, $11,000 in all. In 1850, the defendant then stood in the same condition as Mrs. Duplessis, vested with the same rights and subjected to the same obligations.

The history of the Association, the object, tenor and character of its charter, the vicissitudes through which its stockholders, its creditors, the State have passed, the tale of its protracted and onerous liquidation are familiar to the jurisprudence of this State. In some twelve

cases has the highest Court had occasion to consider the same.  2 An. 1012, 776 ; 3 An. 552 ; 7 An, 319 ; 10 An. 591 ; 24 An. 519 ; 27 An. 535 ; 30 An. 611, 980, 1151 ; 34 An. 770, O. B. 56, fo. 1032.   The legislation concerning it covers no less than sixty-five pages of the statute books.

It is needless, therefore, to enlarge what has already been said on the subject.   It suffices, for the purposes of this case, to know that the Association has long since ceased to be a going institution, and that the liquidation of its affairs was entered upon.   The corporation ceased business, but it never disbanded.   It continually remained under the charge and administration of officials recognized by law.

In order to accomplish the liquidation it was necessary, on the one hand, to ascertain the debts and liabilities, the assets and resources, and on the other, in the event of deficiency or deficit, or, in other words, of inability to pay, or insolvency, the right accrued to collect, without obstruction from the stockholders, contributions wherewith to meet the indebtedness of the concern.  9 An. 265, 341.

It is important to note that the mortgage originally consented was furnished to secure the payment of the value of the stock subscribed for, and also to secure the payment of the bonds to be issued by the concern at 5, 10 and 15 years, for the purpose of raising the capital necessary for banking operations.   It was on the failure of the institution thus to raise the capital that the State, becoming a stockholder in 1828, issued her bonds, the payment of which, fixed to June, 1843, became secured in the manner indicated by Act No. 19 of that year.

In 1830, the legislature granted two years after the expiration of the charter in 1843 to close the affairs of the Association.   In 1835, the payment of the bonds of the State was postponed to June, 1848.   In 1843, the assets of the Association were taken possession of by the State, so to remain under her management until final payment of all the bonds issued by her in its favor.   In 1847, the bonds were extended 6, 9, 12, 15 and 18 years, and a contribution was authorized to be raised, sufficient to meet the obligations of the State, to be divided into instalments running from one to seventeen years.

In 1853, by Act 113, the president and directors, constituted in accordance therewith, became and remained the sole liquidators, representing both the corporation and the State, and as such were entitled to the possession and exclusive management of the assets and affairs thereof.

In 1866, the legislature authorized a further postponement of the payment of the bonds of the State for ten years and a prolongation of the liquidation of the concern until the maturity of the bonds thus extended.

A careful and attentive survey of the whole legislation, however

obscure, on the subject of this Association, satisfies the mind that the right of action against the stockholders for the payment of their shares in whole or in part, was not an absolute, unconditional one, but an eventual one, not to arise unless in a contingency, a deficiency in the assets, an inability to pay, until a *call* for that purpose had been actually made. Hence, that right accrued only the moment the assessed instalments matured, and becoming exigible, were demanded.

The contribution called for in 1847 was of $6 per share, during 17 years. The defendant has paid all, up to 1860, but since has failed to pay any. He pleads prescription in defense.

The proposition is unwholesome that prescription does not run on money claims of the description of those sued on against corporations, whether going or not. It is only where the claim has not ripened by the happening of a contingency, in contemplation for its maturity, that prescription does not run.

The initial point in this case, when prescription began to run, was not precisely the happening of the contingency which justified the call for a contribution, but *was the call itself*.

The payment of the obligation of the stockholders to the Association was secured by a mortgage and not by a pledge. It is the payment or reimbursement of the bonds of the State that was secured by a pledge. Hence, the stockholders can plead prescription against the Association, while that defense cannot be set up against a claim of the bondholders, or of the State, although the pledge may itself be destroyed by prescription.

This suit is not by a bondholder, or by the State subrogated, but by the Association for a partial payment of the shares secured by the mortgage. A pledge keeps a debt alive, a mortgage does not.

It does not appear that the stockholders have ever assumed the liability of the Association or have, at any time, consented that their obligation in its favor and the mortgage guaranteeing it, be pledged to secure it. Whatever the effect of the pledge may be as to the Association, it cannot prevent the stockholders from pleading prescription against the Association, when it seeks to enforce payment of the obligation pledged as a security for its debt.

Prescription proves destructive of money claims owned by married women, minors and interdicted persons, the responsibility for permitting their extinguishment resting on the person who could have interrupted and prevented it from accruing and who did not do so. There is no reason why that mode of extinguishing obligations owned by corporations should not also prevail, in the absence of any statute of immunity taking them out of the rule governing such cases.

The liquidators should have brought suit, on the failure of the

defendant to respond, for the recovery of the contributions raised under the Act of 1847, or, at least, before prescription could have extinguished the right of action. This suit was instituted in 1881, far more than ten years after the maturity of the last instalment in 1865. 3 An. 181; 9 An. 342; 13 An. 259. Whether the action was prescribed by five years it is not necessary to decide, as it was surely extinguished by the lapse of ten years.

The suit for the five instalments, ending in 1865, must then abate in favor of the defendant.

It now remains to be determined whether the plaintiffs can recover the contribution of $40 per share, assessed under the Act of 1878.

That contribution is nothing but a part of the original debt contracted for the purchase of the shares, the payment of which was secured by conventional mortgage. The debt contracted was the value of the shares, which was to be paid at no specified date, but eventually only.

In Clinton & Port Hudson R. R. Co. vs. Eason, 14 An. 876, although the plea of prescription was not sustained, the Court considering and discussing the very question and reviewing the previous ruling in 3 An. 181; 9 An. 342; 7 An. 116; 13 An. 259; 12 An. 528, announced the doctrine, that where the liability of a stockholder in an incorporated company, on a mortgage given to secure the subscription to the capital stock depends on a future contingency, prescription does not begin to run unless that contingency has happened, which was to make the payment of the subscription demandable. We concur in that proposition, which we consider well founded in law.

In the present instance the contribution of $40 was *called* under the provisions of the Act of 1878, and five years have not since elapsed.

We will now proceed to consider summarily the other defenses, some of which could be considered as inconsistent and self-destructive.

That of novation is not sustained by the evidence. The debt of the defendant to the Association is, in nature, what it was when Mrs. Duplessis incurred it. It has not, in the least, been since changed or modified. This defense was rather designed to defeat the indebtedness to the State, but it cannot avail. The giving of new bonds in place of the old ones, although it discharged the liability of the State to the holder, was not destructive of the rights of such holder against the Association, rights which the State acquired, as was already said, both by a conventional and by a legal subrogation.

The defense, if of any force, that the payment of all the instalments under the call made in 1847, operates as a discharge for the surplus of the subscription, cannot avail the defendant, as he has not paid them.

55

That he is relieved by prescription from paying the contributions claimed is not an equivalent for payment. Prescription is not the coin recognized by creditors for the satisfaction of their claims. It is not *money*.

The defense touching the *quantum* of liability, on the assumption that it could relieve the defendant, cannot be inquired into, in the absence of evidence to substantiate it.

There may have been and, no doubt, there has been for a series of years, a deplorable maladministration of the affairs of the concern, but, at this late hour, the tardy complaint of the defendant cannot relieve him. He was not without remedy. He does not appear to have exercised any right, or sought any relief. For having slept on his rights, he can blame no one but himself. 6 An. 457; 7 An. 114; 9 An. 341.

The evidence does not show that the contribution of $40 is not what it should have been, or that it is excessive. 25 An. 136.

The defense touching the rate of interest is well founded. There is nothing in the record to show that a higher rate than that allowed by law was ever agreed to by the stockholders. The charter and the acts subsequently passed are absolutely reticent on the subject. To such effect was a previous ruling. 10 An. 611.

The last defense, as to the mode in which the obligations of the concern, or of the stockholders to the State can be satisfied, cannot be passed upon in this case. The State is not now asking payment of the bonds issued by her.

The judgment appealed from erroneously allowed the five instalments, the last of which matured in 1865, and also an interest higher than five per cent. on the contributions under the Act of 1878.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be reversed, in so far as it allows the five instalments, aggregating six hundred and sixty dollars and the interest thereon, and interest higher than five per cent. on the contributions under the Act of 1878, of forty dollars per share, aggregating eight hundred and eighty dollars; that it be amended by striking therefrom said allowances, and that thus amended, it be affirmed, plaintiffs and appellees to pay costs of appeal.

Fenner, J., recuses himself, on the ground of interest.

Manning, J., takes no part, the case having been argued and submitted before his appointment.

## ON REHEARING.

MANNING, J. The corporate existence of the Consolidated Associa-

tion was terminated by the judicial decree of forfeiture in November, 1842, made at the instance of the State.    Doubtless in anticipation of this decree, the State had already provided by the Act of that year, that the management of the property Banks, when their charters were adjudged to have been forfeited, should be confided to persons appointed by the State.    Immediately after the decree of forfeiture the State by legislative expression declared that the assets of this Bank are and shall remain in the possession and under the exclusive management of the State until final payment of all the State bonds issued in its favor.    Acts 1843, p. 56.    The Governor accordingly appointed managers who took charge of the affairs of the Bank.

This exclusive management by the State ceased in 1847, when the State proposed by a legislative act that the stockholders should participate in the management, and should elect three of the managers, the State continuing to appoint the others.    This Board, thus composed, was authorized to extend the bonds of the State issued for this Bank to periods ranging from six to eighteen years, and enacted that the liquidation of the Bank " may be continued until the maturity and payment of the bonds thus extended."    This was a permissive contin- uation until 1865.    It was not imperative that it should be thus prolonged.

This important Act further laid upon the managers and directors the duty of requiring of the stockholders such annual payments as would accumulate a fund sufficient to meet the obligations of the State, restricting them only in this, that the equal instalments should run from one to seventeen years.    Acts 1847, p. 76.

The managers thereupon by resolutions determined that under the above Act a contribution of six dollars per share shall be paid by each stockholder of this Association on June 1st, 1849, and on same day of each succeeding sixteen years; and that the sum due on the stock loans by the stockholders shall be divided into eighteen equal annual instalments to be paid on June 1, 1848, and every succeeding June for seventeen years.

The stockholders then met, accepted this legislative Act tendered by the State, and voted to abide by the arrangement and settlement therein provided.    The managers and directors had ascertained by careful calculation that an assessment of $102 per share would accu- mulate a fund sufficient to meet the obligations of the State in behalf of this Bank.    It would produce $612,000, and all of this sum has been paid except thirteen thousand dollars.

The limit of the time thus fixed for the liquidation of this Bank was June 30, 1865.    That time expired and the liquidation was not ended; nor was it continued and extended before its expiration.    The legislature

however assumed in 1866 to prolong this liquidation ten years " and no more," but the stockholders were not consenting parties to this extension, and appeared to have stood on their rights acquired under the Act of 1847. The State assumed more than this, viz., that this Bank was at that moment fully organized, whereas it had been over twenty years in liquidation, and the last Section of the Act of 1847 specially provided that nothing therein should be so " construed as to revive the charter, or permit any forfeited privileges " to be exercised.

The ten years' extension of this Act expired in 1876 and the Bank was as far from being liquidated as when it began. The legislature appear to have abandoned it, and to have adhered to the emphatic " nomore " extension contained in the Act of 1866. Then one of the courts appointed a receiver of the defunct corporation, who took possession of its assets, and shortly afterwards some of the holders of the State bonds issued for it brought suit in the U. S. Circuit Court to have it liquidated there, and three receivers supplanted the single one who had been appointed by the State court. This lasted until May, 1879, when a receiver *pro tempore* was appointed, who retained possession of the assets until June, 1880, when they were turned over to the State.

Meanwhile the Act of 1878 was passed, under which the plaintiffs claim the right to demand the contributions which this defendant resists. But the State is the real plaintiff. The Attorney General appeared in her behalf. She has intervened and joined the nominal plaintiffs, and it is therefore the State that is seeking to enforce payment of the contributions under both Acts of 1847 and 1878.

It is against law and right, and yet more against equity and good conscience, that she should be upheld in it. It is against law because she tendered and proposed a settlement to the stockholders in the Act of 1847, which upon their acceptance of it became a contract with them, which she not only bound herself to perform, but took and held control of the affairs of the dead Association in order that she might perform it. It is against equity because she has received what she at the outset of her bargain, by herself proposed, estimated as sufficient to protect her from her liability upon her bonds issued for the Association, and instead of applying it to the purposes for which she had exacted it, squandered it in riotous living.

The horde of officers—president, vice-president, cashier, receivers, directors—pass before us in this record in lengthened procession, laden with salaries and plethoric with stipends, and the lean and slipperedstockholder, gaunt from forty years' exhaustion, at last holds up his hands in eager, passionate suppliance for relief from this insatiate, ever-recurring hunger for more contributions. For only five and a half years of the forty-one that has elapsed since the decree of 1842

terminated the corporate existence of the Association the expenses are thus summarized:

| | |
|---|---:|
| B. F. Flanders, receiver | $ 7,988 03 |
| A. Eustis, receiver | 4,165 33 |
| L. A. Wiltz, receiver | 2,165 31 |
| J. Calhoun, secretary, cashier, receiver | 16,508 20 |
| Lawyers | 19,546 08 |
| Employees | 3,907 86 |
| W. Steven, president | 3,239 93 |
| Master in Chancery | 1,110 00 |
| | $58,630 74 |

That is the domestic expenditure from June, 1876, to January, 1882. Had it been used for the purchase of bonds, it would have bought them to the amount of $100,000. After the most liberal allowance for necessary expenses in conducting the liquidation since 1847, when the State proposed her mode of protecting herself, it is fair to assume that had the funds which the stockholders contributed not been wasted, the full number and amount of the State bonds could have been paid. It is not only fair to assume it, for if these figures are a sample of the forty-one years' expenditures, it can be arithmetically proved to have been sufficient.

The contribution of forty dollars per share now demanded, when six was deemed ample thirty-six years ago, of itself shews the waste of resources. The exaction of this ruinous contribution by the State, the party who has had control of the resources and committed or permitted the waste, is not justifiable in any aspect.

One of the causes of this large exaction is that many of the stockholders have become insolvent, and those who are solvent are assessed for the whole. Even if the assessment of 1847 had not been made for the purpose of protecting the State, and been ample for it, the State cannot increase the burden of each stockholder by holding him not only individually responsible, but each for the other. U. S. vs. Knox, 12 Otto, 423; N. O. Gas Light Co. vs. Bennett, 6 Ann. 457.

The defendant has paid the instalments or contributions under the Act of 1847—actually paid thirteen of them and is protected by prescription from the others. In law he owes nothing on them, and has therefore discharged all liability for them. Whose laches and inaction permitted him to plead prescription successfully? But if he had not paid them, does that non-payment of contributions he owed justify the exaction of contributions he does not owe? If a stockholder has not paid those contributions, let him be compelled to pay them, but it

cannot be legally demanded of him that he shall make good the fund which the State has wasted.

It is therefore ordered and decreed that our former decree is set aside, the judgment of the lower court is reversed, and that there be now judgment in favor of the defendant rejecting the demand of the plaintiff, and for costs.

BERMUDEZ, C. J.　I adhere to the previous opinion.

## CONCURRING OPINION.

POCHÉ, J.　In view of the fact that I had concurred in the previous decree, and of the extended and separate study which I have since devoted to the issues involved in this case, I deem it proper to add my views to the able opinion prepared by my associate.

In our previous opinion in this case we refused to consider the defense urged as to the *quantum* of liability of stockholders to make up the deficit for the payment of the debts of the Association, on account of the bonds issued for it by the State, and advanced the following reasons in support of our course:

1.　" The defense, if of any force, that the payment of all the instalments, under the call in 1847, operates as a discharge for the surplus of the subscription, cannot avail the defendant, as he has not paid them."

2.　" The defense touching the *quantum* of liability, on the assumption that it could relieve the defendant, cannot be inquired into in the absence of evidence to substantiate it."

After a thorough reëxamination of the record, a careful consideration of the argument of counsel for defendant on their application for rehearing, and an exhaustive review of the authorities relied upon by them, I have reached the conclusion that we had, to a certain extent, misapprehended the exact nature of the defense on this point.

As I now understand the proposition, the resistance is to the power of the Association to make any other call for contribution beyond that required under the provisions of Act 100 of 1847.

The State has intervened, joining the plaintiff in the present case, and is, therefore, a party under the pleadings.　Hence, to all intents and purposes, the issue presented in the controversy can be tested in the same way as though the State was the real plaintiff, seeking to enforce payment of the unpaid instalments of the call made under the Act of 1847, and of the contribution called for under the authority of Act No. 20 of 1878.

I take it as an undeniable proposition, that this Association ceased to be a going corporation since the 17th of November, 1842, when its

charter was judicially declared to be forfeited, and that the amount or extent of the liability of the stockholders to contribute ratably to the payment of the debts of the concern was fixed according to the financial condition of the Bank at that date, and that the corporation was henceforward powerless to perform any corporate act; nothing being then left to do but to proceed to a liquidation of the concern.

Such was the understanding of the State authorities, and of all other parties concerned at the time, and hence, a liquidation of the Association was immediately ordered by legislative authority, under the provisions of Act No. 92 of 1843.

Now, as the State had issued, for the credit of the Bank, all the bonds which were outstanding, and had secured her liability by a pledge on all the stock mortgages and other assets of the corporation, her only security and her exclusive safety consisted in a proper control of the assets of the concern.

Hence, it is, that Section 3 of the Act provides : " That the assets of the Consolidated Bank of the Planters of Louisiana are and shall remain in the possession and under the exclusive management of the State of Louisiana, until final payment of all the State bonds issued in its favor."

Proceeding in the liquidation the State authorities soon reached the conclusion that a call on the stockholders was necessary to create a fund needed for the payment of the debts.

·This prompted further legislation on the subject, and culminated in Act No. 100 of 1847, which made ample provision to that effect. Section 6 ordered : " That it shall be the duty of said managers and directors to require such annual or periodical payment from the stockholders of the Consolidated and Citizens' Bank, independently of their stock obligations, as will accumulate a fund sufficient to meet, faithfully and regularly, the obligations of the State for account of these Banks ; provided, the amount required from the stockholders of the Consolidated Association be divided in equal instalments, running from one to seventeen years," etc.

In obedience to this mandate the board of directors of the plaintiff Company met on the 6th of June, 1847, and adopted the following resolution :

" Résolu qu'aux termes de l'acte approuvé le 6 avril 1847, une contribution de six piastres par action sera payable par chaque actionnaire de l'Association Consolidée le 1er de juin de l'année 1849 et le 1er de juin de chacune des seize années qui suivront."

This contribution was equivalent to a call of $102 per share, and the number of shares being 6,000, the total amount contemplated in the call was, therefore, $612,000.

The resolution was made in express compliance with the require-
ments of the Act; it must have been preceded by an examination into
the financial condition of the concern, and it must have been predi-
cated · on a full statement of the debts to be paid, and the amount of
the assets then held in pledge by the State. Hence, the resolution of
the Board must be construed as a declaration from the State to the
stockholders, that a payment of $102 on each and every share held by
them would release them from any and all liability as stockholders, on
account of the bonds issued by the State in favor of the corporation.

This declaration when acted on and accepted, as it was, by the
stockholders, ripened into an inviolable contract between the State
and the stockholder. If any stockholder, having no loan mortgage,
had then stepped up to the Bank, and had paid in full the amount
which was exigible only by instalments in seventeen years, it will
hardly be gainsayed that he was entitled to a full discharge. ·How
then can it be conceived that, in the legislative mind, any other call
was then possibly contemplated?

The well known history of this interminable liquidation informs us
that this contract has not been faithfully executed by the board en-
trusted with its management, and the subsequent insolvency of a large
number of the stockholders has rendered impossible any collection
from them.

Although the law provided very rigorous measures to secure and
enforce the payment of the instalments under the call, such as pledges
on growing crops and the like, it appears that many instalments remain
unpaid. It appears further, that by means of large, useless and ex-
travagant expenditures, in the shape of unnecessary salaries and
lawyer's fees, a considerable proportion of the assets realized have been
misappropriated, and that a large deficiency still exists, to supply
which an additional call of forty dollars per share has been made by
the board of directors under authority of Act No. 20 of 1878.

Without the necessity of passing upon the alleged unconstitution-
ality of that Act and of the Act of 1866, under which this liquidation,
which was to have legally terminated in 1865, has secured a new lease
of life, it is safe to conclude that, under the effect of its own legislation
and under its solemn contract with the stockholders of this corpora-
tion, the possession and control of whose assets was taken by the
State and administered under her instructions and under her authority,
the State alone must be held reponsible for all the acts of maladminis-
tration and spoliation, including the unwarranted interference ·of a
federal court, which have together brought about the result with
which we are now concerned.

By her own acts the State has placed herself in the attitude of a

creditor who accepts the surrender of his debtor and undertakes to husband the latter's resources. Such a creditor could find no relief in the courts, if his failure to realize assets sufficient to satisfy his claim could be traced to the negligence and mismanagement of his own agents and employees. The neglect of duty and other unauthorized acts of the officers of the State, in this liquidation, have been expressly acknowledged and proclaimed by the legislature in the preamble of Act No. 20 of 1878.

For the reasons given in our previous opinion, the plea of prescription against the unpaid instalments claimed of the defendant, under the Act of 1847, must be sustained.

I, therefore, concur in the decree.